MITEK HOLDINGS, INC. and Mitek
Industries, Inc., Plaintiffs,

v.

ARCE ENGINEERING CO.,
INC., Defendant.

No. 91–2629–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Oct. 31, 1994.

John H. Quinn, III, Armstrong and Teasdale, St. Louis, MO, for plaintiffs.

Gustavo Guitterez, P.A., Stuart J. McGregor, Gary M. Pappas, Popham, Haik, Schnobrich, Miami, FL, for defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

K. MICHAEL MOORE, District Judge.

This case came before the Court for a nonjury trial on Plaintiffs MiTek Holdings, Inc. and MiTek Industries, Inc.'s claim for statutory damages for copyright infringement. Having considered all the evidence, including the testimony of the witnesses, and being otherwise duly advised, the Court enters its Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

## I. FINDINGS OF FACT

### A. BACKGROUND

The parties in this case are in the business of supplying products and services to the wood truss industry. A wood truss is a group of beams that support roofs. A "layout program" is a computer program that graphically draws an architectural blueprint, indicating the size and location of wood trusses on the walls of a structure. This case involves the Plaintiffs' claim, pursuant to 28 U.S.C. § 1338, that a layout program produced by the Defendant, (the "Arce Program") infringed on the copyrights to three of the Plaintiffs' wood truss layout programs, ("Aces Layout Programs," versions 1, 2 and 3).

While any similarity between the programs is hotly disputed, the parties agree that all of the programs share the same author, Emilio Sotolongo ("Sotolongo"). Sotolongo is a largely self-taught computer programmer who began working in the software industry in 1983 on the strength of a karate video game he created after studying computer programming briefly at Miami Dade Community College. While working at Gangnail, a computer software company, Sotolongo was introduced to the wood truss industry.

In 1988, Sotolongo joined Advanced Computer Engineering Specialties, Inc., known as the "Aces/Bemax companies" ("Aces") in Miami, where he was asked to develop a wood truss layout program incorporating the concept of "intersecting planes" to depict three-dimensional representations of truss layouts. At this time, another software company, Online, had developed a program known as "Trusstar" which used intersecting planes and was considered to be superior to existing layout programs that could only depict truss layouts two-dimensionally.

When he was hired, Aces offered Sotolongo two salary options. Sotolongo could receive a straight salary of $700 per week or an annual salary of $25,000, plus 10 percent of the lease revenue generated by the layout program. Having recently married, Sotolongo testified that he chose the higher salary without a percentage of the program. However, Sotolongo testified that he had an informal, oral agreement with his employers that if the layout program was successful, Sotolongo would receive 10 percent of the profits.

A few months after beginning work at Aces, Sotolongo visited a truss manufacturer in the Tampa area to observe Online's Trusstar program firsthand. Trusstar was to serve as a "guide" for the layout program Sotolongo was developing for Aces utilizing intersecting planes. Sotolongo testified that he also intended his program to be more "user friendly" than Trusstar, by logically following the steps a draftsman would go through in developing a layout by hand. Sotolongo testified that his father was a draftsman and that he was familiar with the manner in which layouts were created.

Most of the work on the Aces Program was completed by late 1988, when it was sent to a "beta," or testing site, for debugging purposes. The program was generally distributed for publication purposes on or about March 10, 1989, when Aces displayed it at a seminar to members of the industry. This program, known as Aces Version 1, proved to be extremely successful in a market that had grown increasingly competitive by early 1989, when layout programs were being marketed by other software companies, including Online, Alpine, Hydro–Air and Gang–Nail.

After publishing Version 1 of the Aces Program, Aces directed Sotolongo to work on an improved version that would permit the layout to be printed. Version 1 did not have its own printing functions. Any layout produced by the program had to be input into a different program for printing.

Aces Version 2, first published on September 26, 1990, featured several improvements, including the ability to print, expanded memory to include more than 100 walls and 100 trusses and a rearrangement of the screen, from a three-box to a four-box display, with a top bar main menu. The company published a third version of the program, Aces Version 3, on March 13, 1991. Version 3 included a "viewcut" feature, which color highlighted on the display screen the intersection of adjacent planes as each such intersection was defined.

On or about September, 1990, while Sotolongo was in the process of developing Aces Version 3, MiTek's President of Operations, Art Sordo, approached Sotolongo and offered him a job and a significant raise, to work for MiTek. Sordo wanted Sotolongo to develop an improved version of the Aces layout program for MiTek. Sordo assured Sotolongo that there would be no copyright problems as long as Sotolongo wrote the new program "from scratch." The Plaintiffs offered Sotolongo a $70,000 annual salary as an employee or a $79,000 annual salary as an independent contractor.

After mulling the offer, Sotolongo decided to remain with Aces. Sotolongo testified that his main concern was that he would not be able to work within the constraints of a large company bureaucracy. MiTek required its programmers to keep detailed notes and logs of the steps they took in writing their programs. Sotolongo testified that he worked without notes, often running complex sections of programs over in his mind. Antonio Arce, President of the Defendant Arce Engineering, testified that Sotolongo was one of the most talented programmers he had ever seen. According to Antonio Arce, Sotolongo was able to solve a programming problem in hours that would take a more experienced software designer a month to unravel.

Sotolongo testified that he reported his job offer from MiTek to his employers at Aces. Sotolongo explained his concerns and expressed his desire to remain with the company. But Sotolongo was also concerned about rumors MiTek planned to acquire Aces. Sotolongo testified that he was assured that there were no plans by MiTek to purchase Aces. Aces rewarded Sotolongo's loyalty with a raise to $49,000 per year.

On April 1, 1991, MiTek purchased Aces for $2.5 million and received an assignment of its copyrights to the Aces Layout Programs which are at issue in this litigation. Eugene M. Toombs, MiTek's President and Chief Executive Officer, testified that MiTek's primary motive in acquiring Aces was to obtain the rights to the Aces Layout Programs, principally written by Sotolongo.

Sordo, MiTek's President of Operations, testified that Sotolongo contacted him after the sale was announced and asked if he could accept MiTek's job offer. Sordo testified he told Sotolongo that the offer was no longer on the table because now that MiTek had acquired the Aces Layout Programs it had no need for Sotolongo. However, Sordo testified he told Sotolongo that MiTek wanted him to stay on and offered him a less lucrative salary package, including incentives.

According to Gilles Bouchacourt, one of Aces' co-owners, Sotolongo approached the four co-owners of Aces in approximately February 1991 and asked them to each pay him $50,000, representing 10 percent of the $500,000 each of the owners was to receive as their share of MiTek's payment for the company. The Aces owners refused.

At about the same time, Antonio Arce contacted Sotolongo and met with him to find out if Sotolongo was interested in coming to work for Arce to develop a layout program. Arce knew that Sotolongo was the principal programmer of the three versions of the Aces layout Program.

Arce had an existing layout program but was dissatisfied with it because it could only work on Hewlett Packard equipment and was not compatible with IBM compatible personal computers. Arce told Sotolongo that he wanted him to develop a layout program to

be used on IBM compatible equipment in the Windows environment.

Although extremely successful, the Aces programs were written for the MS–DOS operating system, which was rapidly being replaced by the more user-friendly Windows.[1] The Aces programs mimicked a Windows-type program by giving the user the option of either typing in commands by hand or using a mouse to activate functions of the program through the use of pull-down menus.

There are certain features which commonly appear in application programs written for the Windows environment. These features include the use of icons instead of words, a "frame" around the program which contains certain elements such as a "button" at the top left, scroll bar arrows at the right and the bottom, and a menu bar at the top. A Windows program also has certain file access features, help features, and printing features different from traditional DOS programs, the Plaintiffs' Expert Witness, Dr. Randall Davis testified.

Antonio Arce testified that he instructed Sotolongo to develop the Arce layout program "from scratch." Sotolongo testified that is exactly what he did. Sotolongo did not refer to any notes from the Aces Layout Programs because he had not taken any notes. Sotolongo also erased all source and object codes related to the Aces Layout Programs from his computer at home. All of the Aces Layout Programs were written in C language to operate within a DOS environment. The Arce Program was written in C language but was designed to operate in a Windows environment.

In August, 1991, Sotolongo completed the layout program for Arce and the Arce Program was placed at a Beta test site in North Carolina. This program has been called various names including the "TrussPro Layout Program, Version 1," the "LayoutPro Layout Program" and the "FramePro Layout Program."

Version 1 of the Aces Program is covered by Copyright Registration No. TX–3–175–806 (PX–1), effective November 6, 1991.[2] Version 2 of the Aces Program is covered by Copyright Registration No. TX–2–934–789 (PX–2), effective October 3, 1990.[3] Version 3 of the Aces Program is covered by Copyright Registration No. TX–3–175–805 (PX–3), effective November 6, 1991.

On November 15, 1991, within weeks of registering its assignment of copyrights and the actual copyrights to the original Aces layout program and Aces version 3 of the layout program, MiTek filed this action. The Defendant filed its Answer and counter claim on December 23, 1991. The Defendant's counter claim alleged that the Plaintiffs' institution of this action constituted an abuse of process under Florida law.

■ On December 9, 1993, the Court granted the Plaintiffs' Motion to Dismiss the Defendant's Abuse of Process counter claim (DE # 90). The Court found that an abuse of process cannot be alleged based solely on the alleged lack of merit behind a Complaint. Under Florida law, an abuse of process claim requires that *after* a suit is filed, a process of the court was improvidently used. *Blue Dolphin, Inc. v. United States*, 666 F.Supp. 1538, 1541 (S.D.Fla.1987). Thus, the filing of a

---

**1.** An operating system is a program that allows the user to tell the computer how to use other computer programs. Throughout the 1980s, MS–DOS, by Microsoft, was the most widely used operating system for IBM-compatible personal computers. In the late 1980s, Microsoft developed another operating system, known as Windows, which allowed the user to activate programs and functions with the use of a mouse, a development pioneered by Apple's Macintosh computer line. Windows is considered more user-friendly than MS–Dos because it requires no type-written computer commands.

**2.** This registration was later corrected by a Supplemental Registration No. TX–3–564–806 (PX–

5), effective September 13, 1993. The Supplemental Registration was made to correct the date of first publication which, based on an investigation, was determined to have been on or about March 10, 1989, as discussed supra.

**3.** This registration was later corrected by Supplemental Registration No. TX–3–175–804 (PX–4), effective November 6, 1991. The purpose of the Supplemental Registration was to correct a spelling error and to correct the date of first publication to September 26, 1990. Aces officials had incorrectly listed the date of first publication of Version 2 as the date originally listed for Version 1. This error was rectified by MiTek.

complaint, in and of itself, does not constitute an abuse of process.

■ On December 9, 1993, the Court also granted the Plaintiffs' Motion to Waive Jury Trial on the grounds that the Plaintiffs had elected not to seek actual damages but instead to limit themselves to statutory damages provided by 17 U.S.C. § 504(c) and costs and attorneys' fees, provided by 17 U.S.C. § 505. It is the law of this Circuit that when an equitable copyright infringement action seeks only minimum statutory damages and injunctive relief, there is no constitutional or statutory right to a jury trial. *Twentieth Century Music Corp. v. Frith,* 645 F.2d 6, 7 (5th Cir.1981); *Cable/Home Communication v. Network Productions,* 902 F.2d 829, 852–53 (11th Cir. 1990).

The Court held a 6–day bench trial, December 8–15, 1993. At the close of the trial, the Plaintiffs filed a Motion for a Preliminary Injunction seeking to enjoin the Defendant from using, selling, reproducing or distributing the Arce Program.

## B. ALLEGED SIMILARITIES AT ISSUE

The source code is a computer program written in a programming language understandable to the programmer. The object code is a translation of the source code into a binary language of zeroes and ones understandable by the computer. MiTek retained Dr. Randall Davis, Professor of Engineering and Computer Science at the Massachusetts Institute of Technology, as its trial expert to review and compare the source codes of Aces Version 3 to the Arce Trusspro source code. Dr. Davis testified that there was an approximately 2 percent similarity between the source codes of both programs.[4]

The Defendant Arce Engineering retained Dr. Raimund Ege, Associate Professor of Computer Science at Florida International University, as its trial expert. Dr. Ege testified that there was a less than 1 percent similarity between the source code and object code of Aces Version 3 and the Arce program.

The Plaintiffs also retained another expert, Thomas Zgraggen, a civil engineer with a background in architectural design software, to examine any similarities in the ways the programs interact with the user, including the command structure and graphics, such as the menu items and command choices displayed on the screen. These features are known as the "non-literal" aspects of the program, while the source code and object code are known as the "literal" aspect of the program.[5]

As a preliminary matter, the Court finds that its inquiry in this case is limited to the nonliteral elements of the program, that is, the programs' visual display, user-interface and command tree structure. The Plaintiffs concede that based upon their expert Dr. Davis' analysis, only 2 percent of the literal elements of the programs, that is the source code and object code, are substantially similar. Accordingly, the Plaintiff concedes that, as a whole, the literal elements of both programs are not substantially similar.

The Plaintiffs identified 18 non-literal elements of the Aces Layout Programs that they contend are protected by their copyrights, and have been infringed by the Arce Program. They are as follows:

1. The main menu command system, including the main menu and submenu command tree structure. (Versions 1, 2 and 3).

2. The submenu command and function organization. (Versions 1, 2 and 3).

3. The fact that the program had been developed for IBM and compatible personal computers. Existing layout programs had been developed for other, more expensive computers.

---

4. In light of his conclusion that the programs at issue in this action essentially performed the same function, Dr. Davis found Sotolongo's ability to write a new source code incorporating no more than 2 percent of his former program to be "admirable."

5. The Plaintiff's principal expert, Dr. Davis, also offered an opinion as to the similarity of non-literal aspects of the programs based upon his review of the user manuals for both programs. Dr. Davis concluded that Arce Trusspro is simply "the Windows version" of the Aces Layout programs.

4. The program's ability to automatically fit the drawing into the space available on the screen, using as much of the screen as possible, referred to as "dynamic sizing" in testimony.

5. The "pop-up" 15–key number pad that appears in the drawing area of the screen whenever necessary, enabling the user to enter numbers with a mouse rather than via keyboard entry.

6. The program's short-hand method of entering distances using the mouse. Distances are entered in feet, inches, and sixteenths of inches. Rather than enter the numbers by pointing at the pop-up key number pad and clicking on the respective numbers, when either or both of the latter two distances is zero, the user can simply click the right button on the mouse, thereby entering zeroes without requiring the use of a keypad.

7. Highlighting items selected by the viewer for greater identification and ease of use.

8. Expression of work lines in "UDLR" format—up-down left-right.

9. Expression of work planes without reference to the real walls, the roof, or the ceilings of the building. This feature makes it easier to draw layouts of complicated structures.

10. Description of planes using trapezoids, rather than with arrows or other methods.

11. The use of the word "cut" to refer to the intersection and boundaries of the planes.

12. Use of a reference line to position trusses.

13. Use of a rubber band line to select portions of the drawings for certain editing functions.

14. Expressing 3–D views of the drawing by entry of two angles, rather than by entering distance, height, and view of the structure.

15. A four-box screen organization. (Versions 2 and 3).

16. Use of virtual memory to increase the capacity of the application software. (Versions 2 and 3).

17. Entry of walls in "free" format, rather than just clockwise or counter-clockwise sequence.

18. Editing capabilities. (Versions 2 and 3).

## II. CONCLUSIONS OF LAW

The purpose of the copyright and patent laws, as expressed in the applicable clause of the U.S. constitution, is "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I, § 8, cl. 8; *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.,* 600 F.2d 1184, 1187 (5th Cir.1979).[6]

The Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. § 101 *et seq.* applies this protection to various literary and non-literary works, including computer programs. 17 U.S.C. §§ 101, 102(a) (1982); *Apple Computer, Inc. v. Formula Int'l Inc.,* 725 F.2d 521, 524 (9th Cir.1984). Computer programs are protected by the following provisions of the Copyright Act:

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

17 U.S.C. § 101 (1982).

That Act goes on to state:

Copyright protection subsists, in accordance with this title, in original works of authorship *fixed in any tangible medium of expression,* now known or later developed, *from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.*

Id. at § 102(a) (emphasis supplied).

■ Most courts have determined that copyright protection extends not only to the literal elements of a program, i.e. its source

---

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the 11th Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

code and object code, but also to its "nonliteral" elements, such as the program architecture, structure, sequence, organization and computer-user interface. *See, e.g., Engineering Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335, 1341 (5th Cir. July 13, 1994), *Computer Assocs. Int'l v. Altai, Inc.,* 982 F.2d 693 (2d Cir.1992); *Gates Rubber Co. v. Bando Chemical Indus.,* 9 F.3d 823 (10th Cir.1993); *Lotus Development Corp. v. Paperback Software Int'l,* 740 F.Supp. 37 (D.Mass.1990) (*Lotus I* ). *But see Digital Communications v. Softklone Distributing,* 659 F.Supp. 449, 455 (N.D.Ga.1987). In other words, the holder of a valid copyright is entitled to protection for both the text of the commands the programmer chooses to achieve a certain result and to the way the program looks, sounds and interacts with the user.

In determining whether a copyright of an individual work has been infringed, courts must first separate the protectable elements of the work from the non-protectable elements. In the seminal case of *Baker v. Selden,* the Supreme Court held that ideas, as a general rule, are not protectable by copyright, while the individual expression of those ideas is protectable. 101 U.S. 99, 25 L.Ed. 841 (1880). The Copyright Act explains the term "idea" includes "procedure[s], process[es], system[s], method[s] of operation, concept[s], principle[s], or discover[ies]." 17 U.S.C. § 102(b) (1982).

Courts have had particular difficulty distinguishing between idea and expression in the context of computer programs, especially in the area of nonliteral aspects of the program, such as its user interface and command tree structure. *See, e.g., Engineering Dynamics, Inc.,* 26 F.3d at 1345; *Cable/Home Communication Corp. v. Network Productions,* 902 F.2d 829 (11th Cir.1990); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1236–40 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1252–54 (3d Cir.1983), *cert. dismissed,* 464

U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).

The U.S. Court of Appeals for the Eleventh Circuit has yet to directly address the copyrightability of nonliteral elements of computer programs.[7] Other Circuits have taken different approaches to the problem. *See, e.g., Whelan,* 797 F.2d at 1222 (program's intended purpose is its "idea," all other elements are protectable); *Altai,* 982 F.2d 693 (2d Cir.1992) (program is broken into its abstract elements; non-protectable elements are discarded; remaining elements are compared with alleged infringer, ("abstraction-filtration-comparison test")); *Gates Rubber,* 9 F.3d 823 (10th Cir.1993) (same); *Lotus Development Corp. v. Paperback Software International,* 740 F.Supp. 37 (D.Mass. 1990) (three-part test designed to separate idea from expression and determine whether expression is substantial part of the work); *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465 (9th Cir.1992) (extrinsic-intrinsic test).

The approach that appears to have gained the widest acceptance is the "abstraction-filtration-comparison" test, first articulated by the Second Circuit in *Altai* and most recently adopted by the Fifth Circuit in *Engineering Dynamics* and by the Tenth Circuit in *Gates Rubber.* The test was proposed originally by Prof. Nimmer in his treatise on copyright as a way to "help a court separate ideas [and processes] from expression and eliminate from the substantial similarity analysis those portions of the work that are not eligible for copyright protection." 3 Nimmer, § 13.03[F] at 13–102.17.

In *Gates Rubber,* the Tenth Circuit summarized the test as follows:

First, in order to provide a framework for analysis, we conclude that a court should dissect the program according to its varying levels of generality as provided in the abstractions test. Second, posed with this framework, the court should examine each level of abstraction in order to filter out those elements of the program which are unprotectable. Filtration should eliminate

---

7. In *Cable/Home Communication v. Network Productions,* 902 F.2d 829 (11th Cir.1990), the Eleventh Circuit discussed the copyright protection afforded to the literal elements of a program but did not discuss what protection, if any, exists for nonliteral elements.

from comparison the unprotectable elements of ideas processes, facts, public domain information, merger material, scenes a faire material and other unprotectable elements suggested by the particular facts of the program under examination. Third, the court should then compare the remaining protectable elements with the allegedly infringing program to determine whether the defendants have misappropriated substantial elements of the plaintiff's program. 9 F.3d at 834. The abstraction portion of the test dates back to an opinion issued by Judge Learned Hand, where he described breaking down a literary work into its elements as a means of separating a writer's ideas from his expression. *Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

Unfortunately, Judge Hand's abstraction test is not as easily applied to computer programs as it is to literary works, such as books or films, because the mediums are so different. Unlike a computer program, the copyrightability of a film applies solely to its "user-interface," that is the images and sounds the viewer perceives. In contrast, a computer program has two distinct elements of expression—the literal aspects, including the source code and object code, which tell the computer what to do, and the nonliteral aspects, such as the sights and sounds the program generates on the screen. The *Gates Rubber* case sets forth a uniform, six-part abstraction test for breaking down a computer program's literal elements.[8] *Gates Rubber*, at 835. However, this test is not helpful for this Court's analysis, which focuses on the nonliteral elements of the program.

The Fifth Circuit in *Engineering Dynamics* provided some guidance for the abstraction of nonliteral elements of a computer program. The court found that there is a

"spectrum" of copyrightable material in non-literal elements of computer programs, ranging from the 'blank form' that epitomizes an uncopyrightable idea, through a "high expression, like that found in some computerized video games." *Engineering Dynamics*, at 1344. The court found that "[i]n the middle of the abstraction spectrum sit user interfaces such as that of Lotus 1–2–3, whose menu structure, including its long prompts, contains numerous expressive features." *Id.* at 1344, citing *Lotus I*, 740 F.Supp. at 65–66. Thus, the distinctive garb of a computer-generated Ninja will be afforded the highest copyright protection, while a simple computer prompt asking the user to fill in the blank warrants the least. In the middle, are programs which require the input of significant amounts of information in a common, computer format. The Court finds the programs at issue in this case fall into this middle range of expression.

■■■ Once a program has been broken down into its abstract elements, the next step is to "filter out" the unprotectable elements to obtain a core of protectable expression. In addition to ideas, copyright protection is not afforded to processes, methods or scientific discoveries. Other materials not subject to copyright include facts, information in the public domain[9], and *scenes a faire*, i.e., expressions that are common to a particular subject matter or are dictated by external factors[10]. *Engineering Dynamics*, at 1343. The distilled core of protectable expression is then compared to the alleged infringing program to determine whether it has adopted substantial elements of the protectable core of the copyrighted program. *Gates Rubber*, at 834.

■■■ When comparing the core of protectable elements of the copyright-holder's program to the alleged infringer, the Court will

---

8. The Gates Rubber court states that a computer program can be broken down into six levels of declining abstraction: (1) the main purpose, (2) the program structure or architecture, (3) the modules, (4) algorithms and data structures, (5) source code, and (6) object code. *Id.* at 835, citing John W.L. Ogilvie, *Defining Computer Program Parts Under Learned Hand's Abstractions Test in Software Copyright Infringement Cases*, 91 Mich.L.Rev. 526 (1992).

9. Elements taken from the public domain are not protected by copyright law because they are not "original works of authorship" under the Copyright Act of 1976. 17 U.S.C. § 102(a).

10. For example, scenes of pitching, home runs and cheering crowds appearing in a movie about baseball would not be copyrightable because they are necessarily incidental to the subject.

employ the substantial identicality standard applied by the Ninth Circuit to nonliteral elements of computer programs, such as visual displays. *See Apple Computer, Inc. v. Microsoft Corp.,* 821 F.Supp. 616, 619 (N.D.Cal.1993). *See also Sid & Marty Krofft Television Productions, Inc. v. McDonalds Corp.,* 562 F.2d 1157, 1168 (9th Cir.1977); *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1507 (9th Cir.1987). The Court finds this standard is best suited to maintaining a balance between the need to protect copyright holder's works and the need to permit innovation in the software industry.

■ In order to prevail on a claim of copyright infringement, the plaintiff must show: (1) ownership of a valid copyright, and (2) copying by the defendant of protected components of the copyrighted material. *Feist Publications v. Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). A certificate of registration, if timely obtained, constitutes prima facie evidence of the validity of the copyright. 17 U.S.C. § 410(c). As discussed in the Court's Findings of Fact, the Plaintiffs hold valid copyrights to the Aces Layout Programs. Thus, the Plaintiffs have satisfied the first prong of the test.

■ Copying by the Defendant of a copyrighted computer program may be proven in one of two ways. The first method is with direct evidence of copying. In this case, the Plaintiffs do not rely on direct evidence of copying. The second means of proving copying is through circumstantial evidence. To prove copying by circumstantial evidence, a plaintiff must show: (1) access to the copied program by the defendant; and, (2) substantial similarity between the two programs. *Gates Rubber,* at 832 (citations omitted).

■ In this case, the Defendant had access to all versions of the Aces Layout Programs through Sotolongo. Sotolongo was the principal author of all the three programs while he was employed at Aces. Sotolongo was familiar with both the user interface and the source code and object code of the Aces Layout Programs during the time he was employed by the Defendant. Thus, through Sotolongo the access element has been met.

*See Gates Rubber v. Bando American, Inc.,* 798 F.Supp. 1499, 1508–09 (D.Colo.1992) (access by defendants was shown by the fact that the defendants' employees had previously been employed by the plaintiff).

The question for the Court to resolve is whether the Arce program is *substantially similar* to any or all of the Aces Layout Programs, Versions 1, 2 or 3. First, the Court must determine which aspects of the user-interface and command structure of the Aces Layout Programs are entitled to copyright protection. To make this determination, the Court will apply the abstraction-filtration-comparison test of *Altai* and *Gates Rubber.* Second, the Court will compare the core of protected expression in the Aces Layout Programs to the Arce Program and determine if they are substantially similar. Third, if the Court does find substantial similarity between certain elements of the programs, the Court will determine if the Defendant misappropriated a substantial portion of Plaintiff's programs.

## A. ABSTRACTION

As discussed *supra,* the Plaintiff in this action has identified 18 non-literal elements of its layout programs that it contends are entitled to copyright protection and which Defendant infringed upon. Accordingly, the Court does not need to undertake the abstraction portion of the test and will limit its inquiry as to the copyrightability of these 18 elements designated by the Plaintiff. Instead, the Court will move to the next step, filtration, and determine if the 18 elements are entitled to protection or are non-copyrightable based upon the doctrines of merger, public domain or scenes a faire.

## B. FILTRATION

**1. The main menu command system, including the main menu and submenu command tree structure. (Versions 1, 2 and 3).**

**2. The submenu command and function organization. (Versions 1, 2 and 3).**

■ When the any version of the Aces Layout Programs and Arce Programs are activated, the user is presented with similar

looking screens. Both programs present a rectangular box with two separate menus [11] of command choices, one across the top and another along the right hand side of the screen. The remaining area inside the rectangle is reserved for work space, where the user will draft the layout. The first difference between the expression of the two menus is that the Aces Layout Programs depict their menu and submenu choices as words while the Arce Program depicts its menu choices as pictorial representations of the commands, or "icons." Here, the Plaintiffs seek copyright protection for the order in which its program requests information from the user in the design of a layout, also known as the "command structure" or "command tree structure."

The Defendant argues that the method the program follows to complete its task is a process and is thus not entitled to copyright protection. *Baker* at 104; *Gates Rubber,* 9 F.3d at 837. In *Baker,* the Supreme Court held that an accounting system described in a book was not entitled to copyright protection, however, the author's *description* of the process was copyrightable. 101 U.S. at 104. Subsequent courts have held that an author's description of a process is copyrightable as long as it incorporates some level of originality. *See Gates Rubber* at 837, citing *Applied Innovations, Inc., v. Regents of the Univ. of Minnesota,* 876 F.2d 626, 636 (8th Cir.1989); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1250–51 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).

The Plaintiff's expert witness, Zgraggen tested the command structure of both the Arce Program and the Aces Layout Program Version 3, by using each program separately to perform the same roof truss design on a simple, one-story, L-shaped ranch house. Zgraggen testified that both programs went about the task of designing the roof trusses in an almost identical manner, calling for the user to input specific information at the same point and achieving the same result.

The Court finds the method the Aces Layout Programs follow, including the menu and the sub-menu command tree structure, is a process that is not entitled to copyright protection. The Court agrees with the Defendant's contention that the means by which the Aces Layout Programs undertake their task of drafting roof truss plans mimic the steps a draftsman would follow in designing a roof truss plan by hand.

The Court has examined the way the menu structure and command tree structure appear visually on the screens of both the Aces Layout Programs and the Arce program and has concluded that the programs are not substantially similar. The fundamental difference between the visual depiction of the programs is that the Aces program uses words and abbreviations to represent individual commands, while the Arce program, designed to operate in the Windows environment, uses icons to represent the commands [12]. Viewing the programs strictly in the context of their visual representations, it cannot be said that the word "Truss" is substantially similar to an icon depicting a truss pictorially. Moreover, the Court finds that the way in which the menus function is not substantially similar visually. When a user chooses a menu selection in the Aces Layout Program, the pull down menu appears flush to the left of the screen. In contrast, the pull down menus in the Arce program drop straight down from the icon position overhead.

**3. The fact that the program had been developed for IBM and compatible personal computers. Existing layout programs had been developed for other, more expensive computers.**

11. A "menu," in computer parlance, is a graphical user interface employed to store information or functions of the computers in a place that is convenient to reach, but saves screen space for other images. *Apple Computer, Inc. v. Microsoft Corp.,* 799 F.Supp. 1006, 1037 (N.D.Cal.1992).

12. It is true that the Arce program also uses abbreviations for command choices along the right hand side of the screen, however the Court finds that these menu items are not copyrightable. The Fifth Circuit found that "abbreviations for terms, dictated by necessity or industry standard, are uncopyrightable by themselves." *Engineering Dynamics,* 26 F.3d at 1345.

■ This element merits little discussion. Choosing a particular system compatibility when designing a piece of software, if at all relevant, is relevant only to the literal aspects of the program, i.e. the source code and object code because it does not manifest itself visually. As discussed *supra*, the Plaintiff concedes that the Defendant did not infringe on the literal aspects of the computer program. Accordingly, this aspect of the Aces program is not entitled to copyright protection.

**4. The program's ability to automatically fit the drawing into the space available on the screen, using as much of the screen as possible, referred to as "dynamic sizing" in testimony.**

■ Sotolongo testified that he copied many of the Aces Layout Programs' graphics features from other public domain graphics programs on the market, including the AUTO–CAD illustrator program. The Court notes that the ability of a graphics program to vary the size of the picture is not unique to the Aces Layout Programs. Accordingly, the Court finds that this feature is part of the public domain and is therefore not entitled to copyright protection.

**5. The "pop-up" 15–key number pad that appears in the drawing area of the screen whenever necessary, enabling the user to enter numbers with a mouse rather than via keyboard entry.**

■ Both the Aces Layout Programs and the Arce program allow the user to enter numbers by use of a computer animated "key pad." The user can enter numbers on the key pad by choosing a number and "clicking" it with the mouse. Antonio Arce testified that although the key pad function in both programs is similar, the concept is far from original. Many other programs utilize a computer animated key pad. In fact, the design of the key pad in both programs is a direct copy of the arrangement of number keys in the square key island on the far right hand side of a standard computer keyboard. Finally, the Defendant points out that although the key pads look similar, they appear differently when activated in each program. In the Aces Layout Programs, the keys on the pad change color when the user

clicks the mouse on it. In the Arce program, the keys appear as if they have been pressed.

Accordingly, the Court finds that the key pad element of the Aces Layout Program is not entitled to copyright protection because it was drawn from the public domain.

**6. The program's short-hand method of entering distances using the mouse. Distances are entered in feet, inches, and sixteenths of inches. Rather than enter the numbers by pointing at the pop-up key number pad and clicking on the respective numbers, when either or both of the latter two distances is zero, the user can simply click the right button on the mouse, thereby entering zeroes without requiring the use of a keypad.**

■ While the use of a pop-up, computer animated key pad is drawn from the public domain, some aspects of the use of the key pad may be protectable, if they exhibit a high degree of originality. The Court finds that the Aces Layout Programs' feature that permits the user to click the mouse in lieu of entering zero on the key pad, is original enough to warrant copyright protection.

**7. Highlighting items selected by the viewer for greater identification and ease of use.**

■ The use of highlighting, like the key pad, is a common feature of computer programs. Therefore, the Court finds that it is a part of the public domain and not entitled to copyright protection.

**8. Expression of work lines in "UDLR" format—up-down left-right.**

■ The Court finds that this element of the Aces program is not entitled to copyright protection based upon the doctrine of merger and *scenes a faire*. It can hardly be disputed that a computer program designed to draft plans for roof trusses, requiring the placement of roof support structures on walls, would by necessity, require reference to the terms "up," "down," "left" and "right." Accordingly, the Court finds that such terms are indispensable to a program aimed at designing structures, hence are unprotectable as *scenes a faire*. *Altai*, 982 F.2d at 709,

citing *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir.1980). Moreover, the Court also finds that there is only one way to express the idea of direction in the context of a design program, therefore the idea and expression are considered to have merged. *See NEC Corp. v. Intel Corp.*, 10 U.S.P.Q.2d 1177, 1179, 1989 WL 67434 (N.D.Cal.1989).

### 9. Description of planes using trapezoids, rather than with arrows or other methods.

■ It is undisputed that both the Aces Layout Programs and the Arce Program were not the first truss layout software to employ the concept of intersecting planes in the design of roof trusses. Sotolongo testified that he adopted the planes concept from the Online "Trusstar" layout program. The concept of intersecting planes is an idea that is not entitled to copyright protection, however the expression of that idea may be copyrightable. The Court finds that by employing the intersecting plane method of designing roof trusses, it is incumbent upon the programmer to depict those planes visually. The Plaintiff's contention that instead of depicting planes visually as trapezoid shapes the Defendant could have used arrows, defeats the purpose of the intersecting plane system, which is to allow the designer to draft a truss plan three-dimensionally. Based upon the limited range of expression available to depict planes, the Court finds that the idea and expression have merged.

### 10. Expression of work planes without reference to the real walls, the roof, or the ceilings of the building. This feature makes it easier to draw layouts of complicated structures.

■ As discussed *supra*, the Court finds that the use of intersecting planes is a process that is not entitled to copyright protection. However, although the doctrine of merger denies copyrightability to the depiction of planes as trapezoid shapes, the same cannot be said about the depiction of planes without reference to the connecting walls, ceilings or roof. The Court finds this is an original aspect of the Aces Layout Programs and is therefore entitled to copyright protection.

### 11. The use of the word "cut" to refer to the intersection and boundaries of the planes.

■ As discussed *supra*, in the context of the "up," "down," "left," and "right" functions, the Court finds that use of the term "cut" in the context of designing roof trusses through the use of intersecting planes, is a term of art that is indispensable to the task. Accordingly, the Court finds that it is *scenes a faire*, and not entitled to copyright protection.

### 12. Use of a reference line to position trusses.

■ The Plaintiff argued at trial that the use of a "reference line" in the center of the screen to position trusses, is a unique expressive aspect of the Aces Layout Programs and is not a step in the process a draftsman would undertake to design a roof truss layout by hand. The Court agrees. The Defendant did not demonstrate that use of a reference line falls within any of the exceptions to copyright protection, such as merger, public domain or *scenes a faire*. Accordingly, the Court finds that these elements are entitled to copyright protection.

### 13. Use of a "rubber band line" to select portions of the drawings for certain editing functions.
### 14. Editing capabilities. (Versions 2 and 3).

■ The Aces Layout Programs feature two distinct editing functions. The first allows the user to form a "box" shape of any size over all or a portion of the design. With a keystroke, the user can then delete all segments of the design, such as trusses or hip sets, that fall completely within the box. The second editing function allows the user to create a line, similar to stretching a rubber band, from a point on the screen. The line is then used as a kind of eraser to remove all elements of the design that fall within its path. The Plaintiffs contend that the "rubber band line" editing function is an original aspect of the Aces Layout Programs that is entitled to copyright protection.

The Court disagrees. Like the key pad discussed *supra*, the "rubber band line" and

rubber band box editing functions are common features found in many graphic design programs. Accordingly, the Court finds that its protectability is barred by the doctrine of public domain.

**15. Expressing 3–D views of the drawing by entry of two angles, rather than by entering distance, height, and view of the structure.**

■ The Court finds that depicting the design program three dimensionally is a feature of the Aces Layout Programs which is part of the public domain. Nevertheless, the Court finds that the unique method the Aces Layout Programs employ to express its designs three-dimensionally, requiring the user to enter only two angles of the structure, is entitled to copyright protection.

**16. A four-box screen organization. (Versions 2 and 3).**

■ The Defendant argues that it adopted the four-box screen organization of its Arce program from a generalized Computer Aided Design Program (CAD) known as "AUTO–CAD" graphics program. Such a screen display, which includes command menus along the top, down the sides and screen sizing functions along the bottom, is not limited to graphics programs but is common among a wide variety of programs. In considering the copyrightability of "standard" visual displays in software, the Ninth Circuit found:

> The similarity of such functional elements of a user interface or their arrangement in products of like kind does not suggest unlawful copying, but standardization across competing products for functional considerations.

*Apple Computer,* 799 F.Supp. at 1023. Accordingly, the Court finds that the use of a four-box, screen display is part of the public domain, thus this element is not entitled to copyright protection.

**17. Use of virtual memory to increase the capacity of the application software. (Versions 2 and 3).**

■ There was no evidence presented at trial indicating that the use of "virtual memory," or a portion of the program designed to increase the computer's memory to perform more complex designs, manifested itself visually in the user-interface of the program. Thus, the Court finds that it is not a nonliteral element of the program at issue in this litigation. As for its copyrightability as a literal element, Sotolongo testified that he wrote his own memory expander for the Aces Layout Program Version 3 but used a commercial memory expander he obtained on the market known as "Winmem" when he designed the Arce Layout Program.

**18. Entry of walls in a "free" format, rather than just clockwise or counterclockwise sequence.**

■ The Plaintiff argues that other layout programs that were on the market at the time of the Aces Layout Programs, such as the Online Trusstar program, only permitted the user to enter walls connected to a roof plane or another wall. Thus, for example, the user could not enter two walls on opposite sides of a building, unconnected to any other structure.

In considering the copyrightability of an element of a layout program, the proper inquiry is not whether other existing programs utilized that feature but whether that function is part of the logical series of steps a draftsman would undertake to create a plan. If the function falls within such a framework, then it is unprotectable as a process. As discussed *supra,* the Court has concluded that the overall command tree structure of the Aces Layout Programs is uncopyrightable as a process because it mimics the steps a draftsman would take to create a design by hand.

The Court finds that there was no evidence presented at trial indicating that the placement of walls in a "free" format is a part of the logical drafting process. Accordingly, the Court finds that this element is protectable.

In sum, the Court finds that of the 18 elements identified by the Plaintiffs, only the following five are entitled to copyright pro-

tection: the Aces Layout Programs' (1) shorthand method of entering distances with the mouse, (2) expression of work planes without reference to real walls, (3) use of reference line, (4) entry of walls in free form and (5) expression of 3–D views of a drawing by entry of two angles.

## C. COMPARISON

■ Having distilled the Plaintiffs' programs to their core of protectable expression, the Court now must compare these elements to the Defendant's program. If any of the core elements have been copied, the Court will look at the relative importance of the copied elements to the overall program to determine whether or not the Aces Layout Programs are substantially similar to the Arce Program. *See Gates Rubber,* 9 F.3d at 834; *Altai,* 982 F.2d at 710 (in determining whether infringement has occurred, court must look at "the copied portion's relative importance with respect to the plaintiff's overall program").

The Court finds that of the five protectable elements identified in the Aces Layout Programs, four are substantially similar to elements in the Arce programs. A finding of a substantial similarity does not end the Court's inquiry, however. To find infringement, the Court must also determine that the Arce Program has appropriated substantial elements of the Aces Layout Programs. The Court has reviewed the programs and concludes that these five elements are not significant in the context of the Aces Layout Programs as a whole. The programs' shorthand method of entering distances with the mouse, the expression of work planes without reference to real walls, the use of reference lines, the entry of walls in free form, and the expression of 3–D views by entry of two angles simply are not central to the operation of the Aces Layout Programs. They are instead *de minimus* and thus do not warrant a finding of substantial similarity. *See Apple Computer* at 623, citing 3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 13.03[F] at 13–102 (1992).

Finally, the Court notes that the Ninth Circuit has found that works consisting largely of uncopyrightable elements, as in the instant case, are entitled to limited copyright protection. *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 205 (9th Cir.1989), *on remand* 1991 WL 138317, *rev'd on other grounds,* 5 F.3d 536 (9th Cir.1993). The Ninth Circuit describes this type of work as a "compilation." The court in *Apple Computer* stated that when considering the copyrightability of compilations, "infringement should not be found in the absence of 'bodily appropriation of expression,' and that bodily appropriation occurs only if there is "copying or unauthorized use of substantially the entire item." *Apple Computer,* 821 F.Supp. at 623, citing *Harper House* at 205.

■ The Court finds that even when viewing the Aces Layout Programs as compilations of uncopyrightable material, the programs are not substantially similar to the Arce Program. The Arce Program depicts its commands as icons in the Windows environment, rather than as words as in the Aces Layout Programs, thus there is no bodily appropriation of the entire visual display. The bodily appropriation standard requires a finding of virtual identicality. *Id.* As discussed above, the visual display of the Arce Program differs sufficiently, if not substantially, from the Aces Layout Programs to preclude a finding of virtual identicality.

The attraction of the Windows environment, or platform, is a difference *with* a distinction, as the market has made clear to even the most casual of users. The nonliteral aspects of Windows programs, i.e., the way the programs interact with the user, were specifically designed for enhanced ease of use. Indeed, the frequent choice among computer users of a Windows versus a DOS format is evidence, in and of itself, of the dissimilarities between these formats. The dissimilarities which exist between the nonliteral elements of DOS and Windows programs generally, exist in the specific context of the Aces Layout Programs versus the Arce Program.

In sum, the Court has determined that on balance, the Aces Layout Programs consists mostly of elements that are unprotectable based upon the doctrines of merger, *scenes a faire* or public domain. Of the protectable elements that are substantially similar, the Court has found that their lack of importance in the context of the programs as a whole renders any copying by Arce to be *de minimis*. Accordingly, judgment shall be entered for the Defendant on the Plaintiffs' claim for copyright infringement and the Plaintiffs' Motion for a Preliminary Injunction is hereby DENIED.

DONE AND ORDERED.