[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 7, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15364
Non-Argument Calendar

_____

D. C. Docket No. 01-01223-CV-HS-J

ANNIE LAURA THOMPSON,

Plaintiff-Counter-Defendant-Appellant,

versus

LOONEY'S TAVERN PRODUCTIONS, INC.,
a.k.a. Looney's Entertainment Park,

Defendant-Counter-Claimant-Appellee,

LANNY MCALISTER,
FREE STATE OF WINSTON HERITAGE ASSOCIATION, INC.,
a.k.a. Free State Productions,
JENNY MAC PRODUCTIONS,
GARY GOCH, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Alabama
_____

**(November 7, 2006)**

Before ANDERSON, BLACK and BARKETT, Circuit Judges.

PER CURIAM:

Annie Laura Thompson appeals the district court's grant of summary judgment in favor of defendants Looney's Tavern Productions, Free State of Winston Heritage Association, Inc., James Posey, Gary Goch, Joseph Cohen, Lanny McAlister and JennyMac Productions (together, "Defendants"). Thompson argues on appeal that the district court erred in granting Defendants summary judgment on the claims of copyright infringement and breach of contract. Specifically, she contends that: (1) historical facts are copyrightable; (2) the alleged infringing works were substantially similar to the copyrighted works; (3) the 1996 sequel was not licensed to Defendants under the 1995 Settlement Agreement; and (4) her infringement claim regarding the 1998 and 1999 scripts were not barred by estoppel.[1]

---

[1] Thompson also briefly raises a few procedural/case-management issues on appeal. (Blue Brief at 16-21). She requests that summary judgment be entered in her favor, an issue not properly before this Court because, as Thompson concedes, she did not so move below. Narey v. Dean, 32 F.3d 1521, 1526-27 (11th Cir. 1994) ("In general, issues not raised in the district

2

**STANDARD OF REVIEW**

We review <u>de novo</u> the district court's grant of summary judgment, viewing the evidence in the light most favorable to the party opposing the motion. <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1214 (11th Cir. 2000). "Summary judgment is only proper when there are no genuine issues of material fact." <u>Id.</u> Additionally, we review a district court's evidentiary rulings for abuse of discretion and will reverse only if the moving party establishes that the ruling resulted in a substantial prejudicial effect. <u>See</u> <u>Alexander v. Fulton County, Ga.</u>, 207 F.3d 1303, 1326 (11th Cir. 2000).

**APPLICABLE LAW**

<u>A. Test for Copyright Infringement</u>

To establish copyright infringement, a plaintiff must prove, first, ownership

---

court will not be considered on appeal."). Thompson complains that the district court improperly denied her leave to amend, but ignores the many amendments that were permitted. <u>Andrx Pharmaceuticals, Inc. v. Elan Corp., PLC</u>, 421 F.3d 1227, 1236 (11th Cir. 2005) ("We review the district court's denial of a motion for leave to amend for clear abuse of discretion. Under the Federal Rules of Civil Procedure, after a responsive pleading has been filed, a litigant must obtain leave to amend the complaint, which 'shall be freely given when justice so requires.' Fed. R. Civ. P. 15(a). Leave may be denied because of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.") (citations omitted). She argues that the district court erred in denying an extension of the discovery period and in deciding issues piecemeal. (Blue Brief at 21-22). The district court did not abuse its discretion in its management of the case. <u>See</u> <u>Burks v. American Cast Iron Pipe Co.</u>, 212 F.3d 1333, 1336 (11th Cir. 2000) ("A district court's refusal to grant a continuance of summary judgment motion in order to conduct discovery is reviewed for abuse of discretion.").

3

of a valid copyright and, second, copying of constituent elements of the work that are original. Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). To satisfy the first requirement of Feist, "the Plaintiff must prove that the work as a whole is original and that the plaintiff complied with the applicable statutory formalities." MiTek Holdings, Inc. v. Arce Engineering, Inc., 89 F.3d 1548, 1553-54 (11th Cir. 1996) (internal quotation omitted).

Feist's second requirement "'involves two separate inquiries: (1) whether the defendant as a factual matter, copied portions of the plaintiff's [work]; and (2) whether as a mixed issue of fact and law, those elements of the [work] that have been copied are protectable expression and of such importance to the copied work that the appropriation is actionable.'" MiTek, 89 F.3d at 1554. Stated differently, a defendant's work must be substantially similar to the plaintiff's protected expression. Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 (11th Cir. 1994).

Furthermore, "for similarity to be substantial, and hence actionable, it must apply to more than simply a de minimis fragment." See 2 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 8-24, §8.01[G] (2002). "Ordinarily, the importance of but one line in plaintiff's work would be regarded as de minimis, not justifying a finding of substantial similarity." See Id. at 13-50, §13.03[A][2].

4

In copyright cases, "summary judgment is appropriate if (1) the similarity concerns only noncopyrightable elements or (2) no reasonable jury upon proper instruction would find the works substantially similar."  Beal, 20 F.3d at 459.

B.  Work Represented as Factual

Authors who make express representations that their work is "factual" are estopped from claiming fictionalization and therefore a higher level of protection. 1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 2-172.21, §2.11[C] (2002); Houts v. Universal City Studios, Inc., 603 F.Supp 26 (C.D. Cal. 1984) (holding author estopped from claiming fictionalization after express representation work is factual).  See also Beal, 20 F.3d at 459 ("Material that is not original cannot be copyrighted.").

C.  Unprotected Facts

No one may claim originality as to facts. Facts may be discovered, but they are not created by an act of authorship. One who discovers an otherwise unknown fact may well have performed a socially useful function, but the discovery as such does not render him an "author" in either the constitutional or statutory sense.

1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 2-172.16, §2.11[A] (2002); see also Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1372 (5th Cir. July 1981) (holding there is no protection for industrious collection). "Notwithstanding that enormous effort and great expense may have been required

5

to discover factual information, it may, nonetheless, be freely taken from the original writer's copyrighted work and republished at will without need of permission or payment." Craft v. Kobler, 667 F.Supp. 120, 123 (S.D.N.Y. 1987).

### D. Historical Works Are Due Only Very Limited Protection

[T]he protection afforded the copyright holder has never extended to history, be it documented fact or explanatory hypotheses. The rationale for this doctrine is that the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past. Accordingly, the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain. . . . [A]bsent wholesale usurpation of another's expression, claims of copyright infringement where works of history are at issue are rarely successful.

Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 974 (2nd Cir. 1980). "One cannot build a story around a historical incident and then claim exclusive right in the use of the incident." Echevarria v. Warner Bros. Pictures, Inc., 12 F.Supp. 632, 638 (S.D. Cal. 1935).

### E. "Substantial Similarity"

When dealing with historical works, "it is expected that there would result some similarity of treatment." Eisenschiml v. Faucett Publications, Inc., 246 F.2d 598, 604 (7th Cir. 1957). Evidence showing the duplication of historical facts and ordinary phrases does not raise a triable issue of fact. Narrell v. Freeman, 872 F.2d 902, 913 (9th Cir. 1989).

Moreover, "because it is virtually impossible to write about a particular historical era or fictional theme without employing certain 'stock' or standard literary devices, we have held that scenes a faire are not copyrightable as a matter of law." Hoehling, 618 F.2d at 979. "Scenes a faire," which are "sequences of events which necessarily follow from a common theme" or "incidents, characters, or settings that are indispensable or standard in the treatment of a given topic" are not copyrightable and not protectable. Herzog v. Castle Rock Entertainment, 193 F.3d 1241, 1248 (11th Cir. 1999).

## Application of the Law[2]

### A. Count 1

Summary judgment was appropriate as to Appellant's claims of copyright infringement of Tories of the Hills, Free State of Winston, and So Turns the Tide by the following works: (1) scripts and performances in 1996, 1997, 1998, and 1999 of the play "Looney's Tavern: the Aftermath and the Legacy"; (2) scripts and performances in 2000, 2001 and 2002 of the play "The Incident at Looney's Tavern"; and (3) the "Freedom Run" screenplay. Because Appellant's claims with respect to 1996 and 1997 are barred by the statute of limitations, the district court dismissed them and Appellant does not challenge that on appeal.

---

[2] Appellant's motion to supplement the record with Doc, 369 is GRANTED.

### 1. 1998-1999 Plays

Appellant's claims based on the 1998-1999 plays are barred by estoppel. The elements of estoppel in a copyright infringement action are: (1) the party to be estopped must know the facts of the defendant's infringing conduct; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) he must rely on the plaintiff's conduct to his injury. Tefel v. Reno, 180 F.3d 1286, 1302 (11th Cir. 1999) (setting out the traditional elements of estoppel).

Appellant admitted that she knew that Looney's was performing the play since 1996. Not only was Looney's told by Appellant's counsel that the play was not infringing, the Appellant never informed it or the other Defendants otherwise. Looney's Tavern did not know that Appellant thought the 1996 play was infringing and, on that basis, performed the play for the next four years. Therefore, the district court did not err in finding that Appellant's claims for performances in 1998-1999 were barred on the basis of estoppel. Hayden v. Chalfant Press, Inc., 177 F.Supp. 303, 312 n.20 (S.D. Cal. 1959). Moreover, Appellant may not assert rights in the future to the 1996 play should Looney's Tavern choose to perform the play again. Id.

The claims are also barred by license. While Appellant asserts that the attorneys who gave consent had no authority to act for her, it was undisputed that Appellant's sister and co-owner of all copyrights, Yarbrough, reviewed the 1996 script and agreed with her lawyers that it was non-infringing. It was also undisputed that Yarbrough's lawyers, who were also Appellant's lawyers at one time, communicated this approval to counsel for Looney's Tavern. A joint owner of a copyright, such as Ms. Yarbrough, may grant licenses to a jointly-owned work without the consent of the other joint owners. 1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 6-30, § 6.10 (2002); see also Meridith v. Smith, 145 F.2d 620, 621 (9th Cir. 1944). A license is an effective defense to an infringement action brought by another joint owner. NIMMER at § 6.10. Ms. Yarbrough's consent and permission alone granted Looney's Tavern a non-exclusive license to perform the 1996 play script. See Korman v. HBC Florida, Inc., 182 F.3d 1291, 1293 (11th Cir. 1999) ("While an exclusive license to use copyrighted material must be written, a nonexclusive license can be granted orally or can be implied from the conduct of the parties."). Therefore, based on license, and the fact that the plays were nearly identical, the scripts and performances of the 1998-1999 plays were non-infringing.

2. The 2000 Play

The 1995 Settlement and Release Agreement granted Looney's Tavern the right to use in future scripts and performances portions of the book Tories of the Hills in the 1989-1995 scripts of the play, "Incident at Looney's Tavern." The 2000 script for "Incident at Looney's Tavern," was identical in all material respects to the 1989, 1991, and 1993 scripts, with only minor and inconsequential changes. Under the 1995 Settlement and Release Agreement, Looney's Tavern was licensed to use the passages appearing in the 2000 script which correspond to passages in the 1989-1995 scripts.

There were only a few minor and inconsequential changes made to the 2000 script which have no corresponding passages in the 1989, 1991, or 1993 scripts. Except as described below, these "new" passages were neither copied from nor "substantially similar" to the copyrighted works. The only "new" passage in the 2000 script which also appeared in one of the works, Tories of the Hills, was the following single sentence: "His associates had, for a time, recognized in him the possibility of a leader and were already looking to him for advice in the economical and political questions of his country." This text appears on page 3, line 11 of the 2000 script to "Incident at Looney's Tavern," and on page 12 of Tories of the Hills. Other than that passage, all of the passages identified by

10

Appellant appeared in one form or another in the 1989-1995 play scripts and were, therefore, licensed pursuant to the 1995 Settlement and Release Agreement.

Appellant also apparently relied on the allegedly similar depiction of Chris Sheets's conduct at the Secession Convention for proof of copyright infringement. That depiction, even if infringing, was the same in the 2000 script as it was in the 1989-1995 scripts, and was, therefore, licensed. Moreover, if Appellant alleged any similarity in the plot, characters, locale, sequence, and mood, this too was insufficient because these similarities stemmed from the 1989-1995 scripts, not the minor alterations made in 2000, and were, therefore, licensed.

Appellant claimed that both the play and Tories of the Hills compared the mansions and fancy way of life of South Alabama with the plain hills of North Alabama. Contrasting Montgomery with a plainer way of life was not only an unprotectable idea, but also constituted scenes a faire, i.e., an indispensable scene when comparing the ideology of the Winston County residents that opposed secession with the pro-slavery stance of the southern part of the State of Alabama. In summary, only a single sentence in the 2000 script bore any similarity to Tories of the Hills.

There was no evidence of any copying or similarity to Free State of Winston or So Turns the Tide. The single sentence to which Appellant pointed was simply

11

background information on one character and was not of such importance to <u>Tories of the Hills</u> that the appropriation was actionable. It simply was one line in a work over 270 pages long. The "substantial similarity" test is simply not met when one, inconsequential passage is used.  See <u>Toulmin v. Rike-Kumler Co.</u>, 137 U.S.P.Q. 533 (S.D. Ohio 1962) (copying of a sentence and a half from a book of 142 pages held <u>de minimis</u>);  <u>Rokeach v. Avco Embassy Pictures Corp.</u>, 197 U.S.P.Q. 155, (S.D.N.Y. 1978) (copying 100 words out of a total of 70,000 held <u>de minimis</u>).

For these reasons, the 2000 script was non-infringing and the district court did not err in granting summary judgment in favor of Defendants as to all claims based on the 2000 script.

### 3. The 2001-2002 Plays

The 1993 and 2001 scripts were the same. The 2001 script (i.e., the 1993 script) was also used for the 2002 season.  Because Looney's Tavern was licensed in the Settlement and Release Agreement to use in future scripts any portions of Tories of the Hills found in the 1989-1995 scripts, and the 2001 and 2002 script were identical to the 1993 script, the 2001 and 2002 scripts and performances were non-infringing, and Appellant's claims based on these works were without merit.

### 4. Claims Against Free State of Winston Heritage Association

In addition to the reasons stated above, summary judgment is appropriate as

12

to Free State because of the undisputed evidence that, from 1998-2002, Free State: (1) did not produce or perform the plays; (2) did not have any input or control over the plays; (3) did not select which plays to perform or on what days plays were to be performed; and (4) did not employ or pay the directors or actors and actresses.

### 5. Claims Against Jim Posey

Likewise, as to Posey, summary judgment is appropriate, in addition to the reasons stated above, because it was undisputed that from 1999-2002 he: (1) was not an officer or employee of Looney's Tavern; (2) did not have the ability to supervise, exercise any control over, or manage the day-today operations of Looney's Tavern, or select the plays to be performed; and (3) had not received any financial remuneration from Looney's Tavern.

### 6.  The "Freedom Run" Screenplay

#### a. As to all Defendants

As an initial matter, Appellant's "Freedom Run" claims were also properly dismissed on the basis of laches. Appellant had known of Defendants' alleged plans to make a movie since 1992, yet waited until May of 2001 to file this lawsuit. Appellant was equitably estopped from now claiming that Defendants' conduct was infringing. Appellant's delay was inexcusable and prejudicial to the Defendants and therefore, her claim was barred by laches. See Danjaq LLC v.

13

Sony Corp., 263 F.3d 942, 950-51 (9th Cir. 2001) ("To demonstrate laches, the defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.").

In addition, even if laches did not apply, the Freedom Run screenplay did not infringe upon the copyrighted works. The uncontroverted testimony of the authors, Lanny McAlister and Gary Goch, was that none of the "Freedom Run" screenplay was copied from, was substantially similar to, or relied upon any protectable subject matter from the copyrighted works. There was only one passage included in the "Freedom Run" screenplay, identified originally by Defendants, that was somewhat similar to a passage appearing in Tories of the Hills. Even if Appellant could prove that the sentence was copied, it was not of such importance to Tories of the Hills that the appropriation was actionable.

Appellant also relied on the following list of what she characterizes as "similarities" between the copyrighted works and the "Freedom Run" screenplay: (1) events take place in the same locales; (2) same settings; (3) same relevant factors; (4) same plot; (5) same theme; (6) same characterization; (7) same places; (8) same mood except for "trite stuff and chewing the fat stuff"; and (9) same pace, except for the "trite stuff and chewing the fat stuff." However, lists of "similarities" alone are insufficient on which to find copyright infringement.

14

Herzog, 193 F.3d 1241, 1257 (11th Cir. 1999).

Because the locations Appellant names are unprotectable historical places and would be indispensable in any story detailing the account of Winston County during the Civil War, she could not claim similarity in protectable expression of these locations. Regarding the same sequence of events, such as the presidential election, Winston County electing Sheets as a representative, Sheets going to the Secession Convention, the Neutrality Convention at Looney's Tavern, and the jailing of Sheets, as historical occurrences, there are very limited ways in telling the story, i.e., in chronological order. The repetition of these events in the screenplay were not infringement. Regarding the debates between Kaiser and Sheets, a debate between two opposing candidates was not only an unprotectable idea, but was also a scene that naturally flows from the historical fact of an election campaign.

Appellant's claims regarding the killing of Tom Pink Curtis, the killing of Andrew Kaiser, the burning of the jail, Union encampments, and scenes with Home Guards failed for the same three reasons Appellant's claims related to the 1996 play failed: (1) all these incidents are historical incidents, not the creation of Wesley Thompson; (2) the incidents naturally flow from and are indispensable to telling the history of Winston County during the Civil War; and (3) the expression

15

used to describe these "incidents" was very different between the screenplay and the Copyrighted Works.

Appellant also claims that similar characters existed in both works, such as the use of the historical character, Chris Sheets. Wesley Thompson, however, described Chris Sheets as "indispensable" to any history of Winston County and the use of this character in telling the history of Winston County was not protectable. Moreover, Appellant admitted that the screenplay's portrayal of Chris Sheets was very different from that of the copyrighted works. Appellant also relied on the character "Cherry Kaiser" in the screenplay and "Cherry Parker" in Tories of the Hills, but did not demonstrate a substantial similarity between the two characters, other than their first names. Appellant also referenced the use of John Walker in the screenplay and Bill Walker in Tories of the Hills, but again failed to demonstrate a substantial similarity between the two characters.

Appellant also claimed the screenplay and copyrighted works contain the same plot and theme, but then stated that "Freedom Run" has no theme. The only similarity in plot between the works identified by Appellant was "a southern belle in love with a Union sympathizer." This generic plot was an unprotectable idea. Appellant also claimed that the pace of the works were similar except for the "trite stuff and chewing the fat stuff." Appellant stated that Tories of the Hills moved

16

"very fast" and has lots of characters and "lots and lots of events." The pace of the screenplay, on the other hand, was slow. For example, it was not until page 63 that the Secession Convention was over (compared to page 34 of <u>Tories of the Hills</u>.) The majority of the screenplay focused on Chris Sheets and his love affair with William Lowndes Yancy's daughter, while <u>Tories of the Hills</u> only involved Chris Sheets through the Secession Convention and the Neutrality meeting at Looney's Tavern, a small part of the book.

Because Appellant cannot meet <u>Feist</u>'s second requirement, i.e., that there was copying or "substantial similarity," the "Freedom Run" screenplay was non-infringing. The district court did not, therefore, err in granting summary judgment in favor of Defendants.

### b. Claims Against Free State of Winston Heritage Association

In addition to the reasons stated above, summary judgment was properly granted as to Appellant's claims against Free State of Winston Heritage Association because it was undisputed that Free State had no involvement whatsoever with the "Freedom Run" screenplay.

### c. Claims Against Looney's Tavern and Jim Posey

Again, in addition to the reasons stated above, the district court properly granted summary judgment as to the claims against Looney's Tavern and Jim

17

Posey. Even if the "Freedom Run" screenplay were found infringing, there was no evidence that Looney's Tavern or Jim Posey had violated any of the exclusive copyright rights under 17 U.S.C. § 106 by publicly displaying, publicly distributing, publicly performing, creating derivative works, or making copies of the "Freedom Run" screenplay. Moreover, there was no evidence of any production plans or money being raised for the project. Further, there was no evidence that Posey had the ability to supervise any activity related to the "Freedom Run" screenplay. It was undisputed that, in 1995, Appellant released all then existing claims against Looney's Tavern pursuant to the 1995 Settlement and Release Agreement and, since 1997, the only activity related to the "Freedom Run" screenplay involving Looney's Tavern or Jim Posey was a visit in the Summer of 2000 to Looney's Entertainment Park by Gary Goch, a co-author of the screenplay, and Joseph Cohen.

### d. Claims Against Joseph Cohen

Likewise, in addition to the reasons stated above, summary judgment was properly granted as to the claims against Cohen because it was undisputed that Cohen's only involvement with the "Freedom Run" screenplay was a visit in the Summer of 2000 to Looney's Entertainment Park with Gary Goch and his providing a copy of the screenplay to a friend for consideration by TNT. Even if

18

the "Freedom Run" screenplay were found infringing, there was no evidence that Cohen violated any of the exclusive copyright rights under 17 U.S.C. § 106 by publicly displaying, publicly distributing, publicly performing, creating derivative works, or making copies of the "Freedom Run" screenplay.

e. Claims Against Gary Goch

In addition to the reasons discussed above, summary judgment was appropriate as to Appellant's claims against Gary Goch because of the undisputed evidence that Goch's only involvement with the "Freedom Run" screenplay since 1997 was a visit in the Summer of 2000 to Looney's Entertainment Park with Cohen, and his providing a copy of the screenplay to Cohen for submission to a friend for consideration by TNT. Even if the "Freedom Run" screenplay were found infringing, the undisputed evidence was that Goch had not violated any of the exclusive copyright rights under 17 U.S.C. § 106 because he never publicly displayed, publicly distributed, or publicly performed the "Freedom Run" screenplay and the last modifications to the screenplay were made in 1995.

7. McAlister and JennyMac

All claims made as to these Defendants in 1999 or thereafter were also barred because there was no evidence that these Defendants had any connection with Looney's or the plays during that time.

19

8. Conclusion

For the above stated reasons, there was no genuine issue of material fact as to the Appellant's claims in Count 1. The district court did not, therefore, err in granting summary judgment in favor of Defendants.

B. Count 2

Summary judgment was appropriate as to Appellant's claim of breach of the 1995 Settlement and Release Agreement by Defendants for: (1) making preparations for a movie when movie rights to Tories of the Hills were reserved to Appellant; (2) generating and performing "Looney's Tavern: The Aftermath and the Legacy" from 1996-1999 when sequel rights and dramatic rights to Tories of the Hills were reserved to Appellant; (3) failing to pay Appellant and her sister 2% royalties of gross ticket sales for performances of "Incident at Looney's Tavern"; (4) failing to keep full and correct books relating to performances of "Incident at Looney's Tavern"; and (5) transferring to Free State the non-exclusive license obtained pursuant to the 1995 Settlement and Release Agreement.

It was only movie rights, sequel rights, and dramatic rights to Tories of the Hills, not the play "The Incident at Looney's Tavern" or even the historical story of Winston County during the Civil War, to which Appellant was entitled. Only if Looney's Tavern infringed the copyright rights to Tories of the Hills would

20

Looney's have breached the contract. For the same reasons discussed above, however, Looney's did not commit copyright infringement. Accordingly, Appellant's breach of contract claims on these counts failed as well.

Summary judgment was also appropriate as to Appellant's breach of contract claims for unpaid royalties as it was undisputed that Appellant and her sister have been paid the 2% of the gross ticket sales for performances of the play "Incident at Looney's Tavern" in 1995, 2000, 2001, and 2002.

Lastly, summary judgment was appropriate as to Appellant's breach of contract claims for Looney's Tavern's purported transfer of the license obtained pursuant to the 1995 Settlement and Release Agreement because there was no evidence such transfer occurred. Nor was there any evidence that Defendants have failed to keep proper books. For the above stated reasons, there was no genuine issue of material fact as to the Appellant's claims in Count 2. The district court, therefore, did not err in granting summary judgment in favor of Defendants.

C. Count 8

Summary judgment was appropriate as to Appellant's claims that Looney's Tavern and Free State refused to account for proceeds from the play. Free State did allow Appellant to review its records for the year 2000, despite the fact that it had no duty to do so. Looney's Tavern repeatedly informed Appellant that, pursuant to

21

the 1995 Settlement and Release Agreement, her designated CPA or attorney was entitled to review the books. She has apparently not taken advantage of that entitlement.

For the above-stated reasons, the district court did not err in granting summary judgment in favor of Defendants. Accordingly, we affirm.

**AFFIRMED.**[3]

---

[3] We also reject any other issues Appellant may have raised in her brief.